**HUDSPETH, Warden, v. McDONALD.**

**No. 2239.**

Circuit Court of Appeals, Tenth Circuit.

June 12, 1941.

Rehearing Denied July 17, 1941.

Homer Davis, of Topeka, Kan. (Summerfield S. Alexander, of Topeka, Kan., on the brief), for appellant.

John Rhodes, of Kansas City, Mo. (Bowersock, Fizzell & Rhodes, of Kansas City, Mo., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This is an appeal by the government from a decision of the District Court of the United States for the District of Kansas releasing Cassius McDonald, the appellee, from the Federal Penitentiary on a writ of habeas corpus.

Appellee was indicted with others in the District Court of the United States for the District of Minnesota, Third Division, in an indictment charging a conspiracy to violate 18 U.S.C.A. §§ 408a, 408c. The indictment charged:

"That heretofore, to-wit: Between September fifteenth, A. D., 1933, or thereabouts, and January fifteenth, A. D. 1935, or thereabouts, the Grand Jurors being un-

able to fix the period of time more definitely, at the City of Saint Paul, in the County of Ramsey, in the State and District of Minnesota, and within the jurisdiction of this Court, and elsewhere in said State and District of Minnesota at places therein unknown to the Grand Jurors, and at the town or city of Bensenville, in the County of Du Page, in the State of Illinois, and elsewhere in said State of Illinois at places therein to the Grand Jurors unknown, and at various other places specifically mentioned hereinafter,

> One Alvin Karpavicz, alias Alvin Karpis, and
> One Arthur Barker, alias 'Doc' Barker, and
> One Volney Davis, and
> One Harry Campbell, alias George Winfield, and
> One William Weaver, alias Phoenix Donald, and,
> One William J. Harrison, and
> One Harry Sawyer, alias Harry Sandlovich, and
> One Byron Bolton, alias Monty Carter, and
> One Elmer Farmer, and
> One Harold Alderton, alias Harold Allerton, and
> One Cassius McDonald, alias 'Cash' McDonald,

then and there being, all of the foregoing persons being defendants herein and hereinafter being referred to individually and/or collectively as 'defendants,' unlawfully did conspire, confederate and agree together and with each other and with various and divers other persons then and there being whose names are unknown to the Grand Jurors and with the following late decedents, namely,

> One Fred C. Goetz, alias George Ziegler, and
> One Fred Barker,

both of whom were living beings during the period of time hereinbefore alleged, to violate the provisions of that certain Act of Congress approved June 22, A. D. 1932, 'Forbidding the transportation of any person in interstate or foreign commerce, kidnap, or otherwise unlawfully detained * * *.' " 47 Stat. 326.

Then followed a detailed statement of the acts of the conspirators which, in substance, included a conspiracy to kidnap Edward George Bremer in the city of St. Paul, Minnesota, the selection of a hideout outside of the state of Minnesota, and his transportation thereto and retention therein. It was agreed that they would hold him for a ransom of $200,000; that they would communicate by means of notes and letters with friends of the victim with reference to the payment of the ransom money and his release; that after the payment of the ransom money they would return the victim secretly by automobile to the state of Minnesota from their hide-out in the state of Illinois; that after having collected the ransom money, in order to avoid discovery and arrest in connection therewith and to the end that they might safely realize and enjoy the profits and fruits of their crime, they would convert the ransom money at various places in the United States and Cuba, deemed by them to be propitious for that purpose, into other money and currency which they would be able to negotiate and pass readily and with safety to themselves in the regular and ordinary channels of trade, commerce and business; and that to accomplish the conversion and disposal and exchange of the ransom money they would aid, abet, assist and counsel one another, in that connection and to that end.

The indictment set forth fourteen overt acts committed in consummation of the conspiracy. Overt Act 11 charged that on September 2, 1934, appellee traveled from Miami, Florida, to Havana, Cuba, to negotiate the exchange of ransom money. Overt Act 12 charged that on September 5, 1934, at Havana, Cuba, appellee exchanged a portion of the ransom money paid to defendants for the release of Edward George Bremer, for $11,000 more or less, in gold. Overt Act No. 13 charged that on September 9, 1934, appellee and defendant William J. Harrison traveled from Miami, Florida, to Havana, Cuba, to negotiate for the exchange of ransom money paid for the release of Edward George Bremer. Overt Act No. 14 charged that on September 10, 1934, at Havana, Cuba, appellee exchanged $72,000 more or less, of ransom money paid to defendants for the release of Edward George Bremer for other currency of the United States of one thousand and five hundred dollar denomination.

Appellee was tried jointly with two other defendants. He was found guilty and appealed from the judgment and sentence of the court to the Eighth Circuit Court of Appeals, where his conviction was affirmed. McDonald v. United States, 89 F.2d 128.

The theory upon which appellee sought release by writ of habeas corpus was that

the District Court in Minnesota had no jurisdiction of the offense charged against him in the indictment and that the judgment of the court was void for the further reason that appellee had been denied the right to be effectively represented by counsel, as guaranteed by the Constitution of the United States Amend. 6. The trial court in the habeas corpus proceeding adopted these contentions, holding that the District Court in Minnesota was without jurisdiction and that the judgment was void because appellee did not have the effective assistance of competent counsel.

██ The scope of the writ of habeas corpus is well defined. The questions that may be explored through the medium of the writ are limited. It has been said time without number that the writ may not be made a substitute for an appeal from a sentence of conviction and that questions that should be raised by an application for review of the judgment of conviction may not be challenged by writ of habeas corpus. It has been held further without exception that the scope of review by habeas corpus is limited to an examination of the jurisdiction of the court whose judgment of conviction is challenged. It is only when the court has no jurisdiction to try a petitioner or when in a proceeding his fundamental constitutional rights have been violated that resort may be had to the writ. These principles are so elemental and so universally accepted that this opinion will not be encumbered with a list of authorities sustaining them.

Here appellee availed himself of all legal rights granted by law to challenge the judgment of conviction. He appealed to the Circuit Court of Appeals, and when the judgment of the lower court was affirmed, filed a petition for rehearing. When this was denied, he applied to the Supreme Court for a writ of certiorari and also asked for rehearing when the application for the writ was denied, and as a last resort he made application to the Supreme Court for a writ of coram nobis. 311 U.S. 683, 61 S.Ct. 64, 85 L.Ed. ——.

Having exhausted every available remedy for review of the judgment of conviction and after having served several years of the sentence imposed by the court, he now seeks his release by writ of habeas corpus. If, as a matter of law, it can be said that the trial court in Minnesota was without jurisdiction to try him or that in the trial fundamental constitutional rights were denied him, he may do this.

██ Appellee in his brief states that: "No place or venue was laid anywhere in the indictment against McDonald." The indictment specifically charged that appellee and the other defendants did "at the city of Saint Paul, in the County of Ramsey, in the State and District of Minnesota, and within the jurisdiction of this Court, and elsewhere in said State and District of Minnesota at places therein unknown to the Grand Jurors, and at the town or city of Bensenville, in the County of Du Page, in the State of Illinois, and elsewhere in said State of Illinois at places therein to the Grand Jurors unknown, and at various other places specifically mentioned hereinafter * * *." Then follows a detailed statement of the acts of conspiracy indulged in by the defendants, including Cassius McDonald, in said places, which acts included as a part of the conspiracy, plans to change the ransom money into other money. There is a specific allegation of the venue of the offense charged in the indictment against McDonald.

Appellee states in his brief that: "Appellee should be tried, if at all, in Florida where, in fact, indictments were lodged against him, and where in fact, if Appellee did in fact conspire, the conspiracy took place and the acts took place. The conspiracy, if it in fact existed, and the acts, if they were in furtherance of a conspiracy, took place in Florida. There is not a scintilla of evidence of any thing alleged or proved having been in anywise connected with Minnesota, but, on the contrary, the Government has, in its proof, nailed the conspiracy and acts, if they existed, to Florida and Cuba."

██ The basis for this statement apparently is that the overt acts with which appellee was charged had their inception in Florida. But appellee was not charged with the offense of receiving or exchanging ransom money. He was charged with having conspired with others in the state of Minnesota to violate 18 U.S.C.A. § 408a. The specific acts which the indictment charged that he committed in Florida and Cuba were overt acts committed in furtherance of the conspiracy. While it is necessary to allege and prove an overt act, the overt act does not constitute the offense. Laska v. United States, 10 Cir., 82 F.2d 672, 674. The gist of the offense

966

of a conspiracy is an agreement among the conspirators to commit an offense, attended by an overt act by one or more of the conspirators to effect the object of the conspiracy, United States v. Falcone, 311 U. S. 205, 61 S.Ct. 204, 85 L.Ed. ——, and the venue may be laid either where the conspiracy was formed or where any overt act in furtherance thereof was committed. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Chew v. United States, 8 Cir., 9 F. 2d 348; Sloan v. United States, 8 Cir., 31 F.2d 902; Yenkichi Ito v. United States, 9 Cir., 64 F.2d 73, 76; Shea v. United States, 6 Cir., 236 F. 97, 101. The court in whose district the conspiracy was formed has jurisdiction to try the defendants, even if no single overt act was committed within its boundary. Brown v. Elliott, 225 U.S. 392, 402, 32 S.Ct. 812, 56 L.Ed. 1136; Hyde v. United States, supra; Hyde v. Shine, 199 U.S. 62, 76, 25 S.Ct. 760, 60 L.Ed. 90; Shea v. United States, supra; United States v. Wells, 2 Cir., 192 F. 870.

■ The conspiracy charged in the indictment had its inception in the agreement to kidnap Bremer but it did not end with the payment of the ransom money and his release. The exchange of the ransom money for other currency was as much a part of the conspiracy as was the kidnaping of Bremer. Laska v. United States, supra; Skelly v. United States, 10 Cir., 76 F.2d 483; Lew Moy v. United States, 8 Cir., 237 F. 50. The object of this type of conspiracy is to get possession of unmarked money which may be used with safety. It begins with the plan to abduct and ends when the ransom money is changed into unmarked currency.

■ Nor does the jurisdiction of the District Court of Minnesota to try the defendant depend upon whether he was a member of the conspiracy from its inception. If, after the ransom money was paid and Bremer was released, appellee, with full knowledge of the conspiracy and its unlawful purpose, agreed to exchange the ransom money for other money, he thereby became a party to it with the same effect as if he had joined it at its inception, Skelly v. United States, supra; Laska v. United States, supra; and would be subject to the jurisdiction of the Minnesota court. Price v. Henkel, 216 U.S. 488, 30 S.Ct. 257, 54 L.Ed. 581; United States v. Wells, supra; McDonald v. United States, supra.

■ Nor is it essential to the jurisdiction of the United States District Court of Minnesota to establish that appellee was actually in Minnesota during any of the time the conspiracy was in effect. For it is recognized by the highest authority in our land that there may be a constructive presence in a state by which a crime may be consummated, as well as by actual presence therein, and that if a crime be consummated by a constructive presence in a state, it may be punished in such state. Hyde v. United States, supra; Brown v. Elliott, supra; Price v. Henkel, supra; Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362.

■ Whether appellee was a member of the conspiracy and did conspire in violation of the law raises an issue of fact. That issue was resolved against him in the trial in the District Court in Minnesota and may not be relitigated in this proceeding. The court below was in error in concluding that the Minnesota court was without jurisdiction.

It is earnestly contended that appellee was denied his constitutional guarantee to have effective assistance of competent counsel. The basis for this contention is that the counsel which he had was so drunk throughout the trial that as a result thereof he in fact had no counsel. The testimony adduced by appellee to sustain this charge will be recounted with some particularity.

After his arrest, McDonald, through his wife, employed Everett Jennings, an attorney of Chicago, Illinois, to represent him in the trial, and paid him a fee of $5,000. In addition he employed John Burns, a local attorney of St. Paul, who represented him in some preliminary matters preceding the trial. McDonald testified in substance as follows:

"Jennings was intoxicated all the time. He was absent from the courtroom for two whole days. I did not call the judge's attention to Jennings' condition. It was obvious to the court. One morning we were called to the bench and I told the court, I said I would like to introduce Mr. Edward Barnard, of Detroit. I said I would like to introduce other counsel. Mr. Barnard was not there. When I asked to introduce other counsel, Judge Nordbye said: 'Go on with the case.' On several occasions the court ordered Jennings removed from the courtroom.

"Q. (By Mr. Davis) Now on any other occasion during the time you were on trial in St. Paul, Minnesota, on any occasion, did you at any time call Judge Nordbye's attention to the fact that you desired other counsel? A. Wasn't my place to."

Robert V. Rensch, an attorney employed to defend one of the defendants, testified as follows: "I do not remember Cassius McDonald asking permission of the court to employ other counsel. I do recall that on the first day of the trial Jennings got up and stated that it was possible that Mr. Barnard would replace him in the trial of the case. That he felt he should call the court's attention thereto before the jury was sworn. The court thanked him, and the understanding was that when Barnard arrived he would step into the trial of the case. Jennings made no announcement of withdrawal. On some occasions, in my opinion Jennings was asleep. The court did not order Jennings removed. I think Jennings was drunk at times. I never saw him take a drink. I think he used it entirely outside of the courtroom. I do not recall McDonald asking the court for leave to employ other counsel."

John Burns, who represented appellee locally, testified that he was present in the courtroom two or three times during the trial but that he was not close enough to Jennings to know whether he was under the influence of intoxicating liquor at that time.

Lewis L. Drill, an attorney employed to defend one of the defendants, testified in substance as follows:

"I observed Jennings' condition throughout the trial as to his use of intoxicating liquors.

"Q. Will you now state to us, whether in that trial, Mr. Jennings was drunk? A. Well, I did not like the term 'drunk.' There are so many implications that can result from that word. I prefer to say that he was on occasions under the influence of intoxicating liquor.

"I would not say the number of times during the trial. Jennings was in the courtroom every day of the trial. Sometimes he came in late. The proceedings were not held up, only on one, or possibly two, occasions when they would be held up a few moments."

Jerome Hoffman, an attorney representing some of the defendants, testified in substance as follows:

"I met Jennings the morning the trial started and saw him in the courtroom as the trial progressed. He was under the influence of intoxicating liquor. I would say that he was under the influence of liquor every day of the trial and throughout the entire trial, some days more so than others. I never saw him take a drink.

"Q. Was it a generally known fact that this lawyer was drunk during this trial or under the influence of intoxicating liquor? A. I cannot in fairness to myself speak for others in answering that question, Mr. Williams. I do not know what others thought but I know that he was, I would say, drunk.

"I have no recollection that he ever asked the court for other counsel. I do not recall that either McDonald or anyone on his behalf asked the court that the trial be stopped and that counsel be substituted for Mr. Jennings."

Eugene D. O'Sullivan, an attorney employed to defend some of the defendants, testified in substance as follows: "It is my opinion that Jennings drank continuously from the beginning until the end of the trial and grew progressively worse. He smelled of liquor and he talked loud. He was respectful in the presence of the jury and the judge when the trial would be actually going on. My judgment is that he was at the trial practically all the time. He cooperated with the rest of the attorneys for the defendants until the end of the case, when he wanted to make the final argument."

From this nebulous testimony, appellee would have us conclude as a matter of law that his constitutional rights were denied him in that he was denied the right to have the effective assistance of competent counsel.

The most that can be said for this testimony is that it establishes that appellee's counsel drank throughout the trial and that he was under the influence of intoxicating liquor to a greater or less degree during the whole trial. But what of it? Appellee employed him; he paid him a substantial fee, and had a right to his services if he desired them, even though he might have been under the influence of intoxicants. Appellee admits that he did not call his counsel's condition to the attention of the court and the only excuse he has to offer is that his condition was obvious to the court. All of the other attorneys who sat

968

around the counsel table with appellee and his lawyer testified that they had no recollection of either appellee or anyone else at any time during the trial asking the court for a continuance to employ other counsel or requesting that other counsel be employed.

But what does Judge Nordbye say?—and appellee concedes his high character and outstanding eminence as a jurist. He positively states that he had numerous conferences with Jennings at the bench and in his chambers; that at no time did he detect liquor on his breath; that there was nothing in Jennings' conduct throughout the trial that would indicate to him that he was under the influence of intoxicating liquors; that his demeanor and conduct at all times were proper. He states that no request was made of him at any time for a continuance for the purpose of securing other counsel or that he appoint other counsel to represent appellee. This testimony was supported by a large number of witnesses in attendance on the trial, including the district attorney, now a federal judge.

There is a vast difference between lacking the effective assistance of competent counsel and being denied the right to have the effective assistance of competent counsel. It is the denial of the right to have such assistance that gives the right to challenge a judgment of conviction by writ of habeas corpus. It is held without exception that the right to have counsel may be waived and that it is only when it is not waived that the validity of the proceedings may be challenged by writ of habeas corpus.

The undisputed evidence is that appellee was represented by counsel of his own selection; that if counsel was drunk that condition was not apparent to the trial judge; that appellee did not call the condition of his counsel to the court's attention; and aside from a vague statement made by appellee, the record is conclusive that no request was made that the court appoint other counsel to represent appellee. The record fails to support the conclusion of the court below that the judgment of the Minnesota court was void because appellee was denied his constitutional right to be represented by counsel.

The judgment is reversed and the cause remanded, with instructions to the trial court to direct the return of petitioner to the custody of the Warden.

Reversed and remanded.