## UNITED STATES ex rel. THOMPSON v. DYE.

### Civ. No. 10303.

United States District Court
W. D. Pennsylvania.

March 14, 1952.

Zeno Fritz and Louis C. Glasso, Pittsburgh, Pa., for relator.

Samuel Strauss, Asst. Dist. Atty. of Allegheny County, Pittsburgh, Pa., Randolph C. Ryder, Deputy Atty. Gen., for respondent.

MARSH, District Judge.

This action is before the court on a petition for a writ of habeas corpus. Cleveland Thompson, the relator, was convicted of murder by a jury and sentenced to death. He alleges that he has been denied due process of law within the intent and meaning of the Fourteenth Amendment in that his court-appointed counsel (1) inadequately investigated and prepared the case between the time of appointment and trial, and (2) failed to protect relator's rights during the course of the trial.[1]

In his behalf present counsel, with commendable diligence, have exhausted every practical remedy afforded by the Pennsylvania courts. Two writs for certiorari have been denied by the Supreme Court of the United States.[2] Because he has not had the opportunity to prove the allegations of his petition we granted a rule to show

1. The alleged trial errors committed by counsel are, in general, matters involving skill, judgment, and strategy. This part of the petition was not stressed.

2. Thompson v. Com. of Pennsylvania, 1951, 342 U.S. 835, 72 S.Ct. 58; 1952, 342 U.S. 929, 72 S.Ct. 370.

cause and heard testimony in order to determine whether this was the "extreme case" which would warrant the release of the relator. See Jones v. Huff, 1945, 80 U.S.App.D.C. 254, 152 F.2d 14. Upon consideration of the evidence it is the opinion of the court that the rule should be discharged and the writ denied.

It appears that relator was indigent and, pursuant to law, 19 Pa. Purdon's Statutes, §§ 783, 784, the Court of Oyer and Terminer of Allegheny County assigned a former assistant district attorney to be his counsel. Thompson was not satisfied and requested the court to appoint Adam B. Shaffer, Esquire. The court demurred but at relator's insistence appointed Mr. Shaffer on December 29, 1949. See Commonwealth v. Thompson, 1951, 367 Pa. 102, 79 A.2d 401, 403. The trial began January 16, 1950 and lasted five days.

Mr. Shaffer is a competent criminal lawyer of some forty years experience in the courts of Allegheny and Westmoreland Counties, Pennsylvania, and has participated in approximately 200 homicide cases. He conferred with relator several times prior to trial and engaged Arthur D. Stevenson, Esquire, to investigate the facts of the case. He did not personally investigate the case but at the trial he interviewed several witnesses whom he expected to call and other witnesses who had been subpoenaed by the Commonwealth.

Mr. Stevenson, a Negro attorney, is a member of the bar and has had considerable experience in the criminal courts of Allegheny County. He is familiar with the vicinity in which the crime occurred and is acquainted with many of the people who live near the scene of the crime. He testified that he spent 62 hours in conducting an investigation on behalf of the relator and conferred with the relator and Mr. Schaffer on several occasions prior to trial.

The relator offered the following proof to demonstrate that he did not receive the thorough investigation and adequate preparation to which he was entitled. Certain public records containing police reports were not examined (Exhibit 2). The files of the Pittsburgh Courier, a Negro newspaper, carrying an account of the murder, were not examined (Exhibit 7). Persons living next door to the barroom where the crime occurred were not interviewed. The criminal records of the Commonwealth witnesses were not checked. The Army medical record of relator indicating that he suffered a mental disturbance in 1944 was not procured. The ownership of the pistol involved was not determined; its ownership could have been traced to one Oscar Carey whom relator now claims gave him the fatal weapon immediately prior to the killing.[3] In addition the evidence reveals persons who are now willing to swear that shortly after the occurrence Thompson appeared to be drunk or doped, and that his clothing was torn; that there were 45 persons in the barroom at the time of the killing;[4] that Thompson did not perpetrate a robbery; and that various other details of the killing were not as represented at the trial.

As might be expected in murder convictions, especially where the death penalty has been imposed, persons who did not see fit to volunteer their testimony at the trial have since been "discovered" and are now lending aid in desperate efforts to save relator's life. It is strenuously urged that these persons would have been discovered easily ante-trial by a thoroughgoing and conscientious investigation. We do not find this as a fact, however, because the asser-

3. At the trial a statement of relator was introduced wherein he said that he owned the pistol and after some trouble in the barroom went to his home to get it and returned to the place of the killing; his testimony at the trial was to the same effect.

4. Five alleged eyewitnesses were produced by the Commonwealth at the trial; rela-tor produced three alleged additional eyewitnesses at this hearing; the latter witnesses were of doubtful credibility and have criminal records involving crimes of crimen falsi or felonies, as does one of the former group. There are echoes of perjury in some of the post-trial affidavits and one person admitted that her affidavit which purported to corroborate relator was false.

tion lies in the realm of speculation. It is significant to observe that thorough post-trial efforts have revealed only three additional eyewitnesses out of the estimated 45 persons who these additional witnesses claim were in the barroom at the time of the killing. The Commonwealth contends that all the eyewitnesses were produced and testified at the trial and the trial judge thought all of them had been produced.

We do find that in some aspects the investigation and preparation of this case were cursory and somewhat superficial; that various details, leads and clues were either overlooked or were not run down. The investigation was not an exhaustive, painstaking one notwithstanding the considerable time spent by Mr. Stevenson. We further find that during the trial Mr. Shaffer defended the relator vigorously according to his experience and judgment. The defense was not a pretense,—at least, at the time of the trial, the judge and district attorney could not have detected it as a fraudulent and false show, if it were one; nor can we now do so with any degree of certainty.

■ Present counsel argue that the alleged insufficiencies amounted to a denial of effective assistance of counsel to which relator was entitled during the vital period between appointment and trial.[5] Even if we assume this debatable proposition to be correct, nevertheless, we reach the conclusion that these alleged derelictions did not result in stamping the trial itself as a farce and mockery of justice. See Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Powell v. Alabama, footnote 5, supra; Brown v. Mississippi, 1936, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Diggs v. Welch, 1945, 80 U.S.App.D.C. 5, 148 F.2d 667, certiorari denied 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002.

In the case of Diggs v. Welch, supra, it was stated that the "absence of effective representation by counsel must be strictly construed. It must mean representation so lacking in competence that it becomes the *duty of the court or the prosecution to observe it and to correct it.* We do not believe that allegations even of serious mistakes on the part of an attorney are ground for habeas corpus standing alone. The cases where the Supreme Court has granted habeas corpus on the ground that there was no fair trial support this interpretation of the absence of effective representation. *They are all cases where the circumstances surrounding the trial shocked the conscience of the court and made the proceedings a farce and a mockery of justice.*" [80 U.S. App.D.C. 5, 148 F.2d 670] (Emphasis added). The court then affirmed denial of the petition without a hearing.

■ If an act or inaction of the State violates the concepts of a fair trial, it offends against the due process clause. "It is state action of a particular character that is prohibited." Civil Rights Cases (U. S. v. Stanley) 1883, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835. This is well expressed in U. S. ex rel. Darcy v. Handy, D.C.M.D.Pa. 1951, 97 F.Supp. 930, 940, where it was held that "[t]he Fourteenth Amendment is directed against state action, not against wrongs done by individuals who do not act for the state or under color of state authority. * * * the defense counsel qua lawyer is not however a state officer within the contemplation of the Fourteenth Amendment."

And in Hudspeth v. McDonald, 10 Cir., 1941, 120 F.2d 962, 968, the court held: "There is a vast difference between lacking the effective assistance of competent counsel and being denied the right to have the effective assistance of competent counsel. It is the denial of the right to have such assistance that gives the right to challenge a judgment of conviction by writ of habeas corpus."

Thus we reach the further conclusion, again assuming the case was insufficiently prepared, that the relator was not denied due process by the violation of duty on the part of any state official, i. e., the trial judge, the prosecutor, or the police, and therefore, has failed to show that he is entitled to the writ.

■ As indicated above, with a life at stake, we thought that a hearing upon the

---

5. See Powell v. Alabama, 1932, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158.

averments of the petition was imperative. By so doing, however, we are not to be understood as condoning the practice of permitting convicts to put their counsel on trial after adverse results of their own trials have been reached. This particularly applies to assigned counsel in a capital case whose task is peculiarly onerous, thankless, and fraught with apprehension. A federal court cannot be used to measure the diligence used in preparing such a case for trial in the state court by counsel of relator's own choice; neither can it be used to try his legal capacity or ability in the trial of such case nor to examine his conscience.

We are now of the opinion that our responsibility to this relator terminated with:

First—the finding, which fact was also admitted, that competent legal counsel selected by relator was assigned to represent him and was given adequate opportunity to consult with him and prepare the case. As stated in Foster v. Illinois, 1947, 332 U.S. 134, 137, 67 S.Ct. 1716, 1718, 91 L.Ed. 1955, "process of law in order to be 'due' does require that a State give a defendant ample opportunity to meet an accusation." The state court certainly afforded relator this opportunity in the instant case.

Second—the finding that the trial itself was not a sham or a counterfeit of justice. As stated in Diggs v. Welch, supra, 148 F. 2d at page 670, "The only practical standard for habeas corpus is the presence or absence of judicial character in the proceedings as a whole." The record of the trial in the light of the evidence offered and received on this rule has convinced this court of the presence of judicial character in the trial of the relator.

Relator also alleges that the Supreme Court of Pennsylvania violated his constitutional rights by failing to grant or direct a hearing on his petition for a writ of habeas corpus in that court. This court granted the hearing out of an abundance of caution in view of the severity of the penalty. Since we find that relator is not entitled to the writ we need not decide this question of law.

An order in conformity with this opinion will be entered.