## UNITED STATES ex rel. THOMPSON v. DYE, Warden.

### No. 11525.

United States District Court
W. D. Pennsylvania.
July 3, 1953.

808

Louis C. Glasso and Zeno Fritz, Pittsburgh, Pa., for relator.

Robert E. Woodside, Atty. Gen. of Pa., Frank P. Lawley, Jr., Deputy Atty. Gen. of Pa., James F. Malone, Jr., Dist. Atty. of Allegheny County, Pittsburgh, Pa., Albert A. Fiok, Asst. Dist. Atty., and Samuel Strauss, Asst. Dist. Atty., Pittsburgh, Pa., for respondent.

MARSH, District Judge.

The relator, Cleveland Thompson, was convicted of murder on January 20, 1950, and the death penalty was imposed. For a history of prior proceedings see D.C., 103 F.Supp. 776; affirmed, 3 Cir., 203 F.2d 429; certiorari denied 1953, 345 U.S. 960, 73 S. Ct. 946. He subsequently filed a petition for a writ of habeas corpus in the Supreme Court of Pennsylvania, alleging that the prosecuting officers suppressed evidence favorable to him. The petition was denied without a hearing. He then filed a petition for a stay of execution in the Supreme Court of the United States. The Supreme Court, after reviewing a proposed petition for certiorari, denied the stay.[1]

■ On this state of the record, we found that he had exhausted his state court remedies. We were persuaded that if the allegations of the petition were proved, a federal question involving due process was presented. See United States ex rel. Almeida v. Baldi, D.C.E.D.Pa.1951, 104 F. Supp. 321, affirmed, 3 Cir., 1952, 195 F.2d 815. We, therefore, out of an abundance of caution, issued a stay of execution, ordered the District Attorney of Allegheny County to answer the petition, and set the case down for hearing. The relator's contention that he was denied due process is without merit.

After hearing and upon due and careful consideration, the court enters the following

Findings of Fact

1. The relator was arrested shortly after 11:00 P. M. on September 13, 1949. At that time, he was somewhat under the influence of alcohol. This fact was known to various members of the police force and

1. The following order was entered:
"June 18, 1953.
Upon examination of this petition, the record in the Supreme Court of Pennsylvania and the proposed petition for a writ of certiorari I find no substantial basis for granting this stay of execution and it is accordingly denied.
Harold H. Burton,
Associate Justice."

Samuel Strauss, Esq., the Assistant District Attorney in charge of the prosecution. The degree of intoxication of relator at that time is a matter of dispute among the persons who saw him.

2. There are those who might have testified that relator was intoxicated at the time of the killing [2] and shortly thereafter,[3] as well as at the time of the arrest.[4]

3. Immediately prior to his arrest, relator was involved in a barroom brawl. Bobbie Richardson, the bartender, described the scuffle wherein three men subdued Thompson and took his gun—the murder weapon. Richardson stated the scuffle lasted from two to five minutes and that in the melee all of the participants fell to the floor. As a result relator's shirt was torn, he was perspiring profusely, and he was in a thoroughly disheveled condition when arrested.

4. After Thompson had been subdued, Patrolmen Stanley W. Dubis and William H. Heagy, in answer to a telephone call, arrived and took relator in a police car to No. 2 Police Station. Later Heagy transported him to No. 1 Police Station. Heagy had to subdue Thompson on this trip.

5. Both Heagy and Dubis noticed an odor of alcohol about the relator. Heagy concluded, from his observation, that relator was in a crazed condition and insane. Dubis, on the contrary, concluded that the relator was perfectly normal and so testified at the trial. It is apposite to note that he was not then cross-examined as to Thompson's condition. At the habeas corpus hearing he testified that Thompson meekly submitted to arrest and conveyance to No. 2 Police Station; he did not accompany the prisoner to No. 1 Station.

6. George W. Purvis, a police officer assigned to the homicide division, saw the relator about midnight. Relator was standing up and holding on to the bars of his cell. He talked to Purvis but his statements were so confused that the police officer decided to postpone the routine interrogation. This observation was incorporated into a lengthy report filed by Homicide Officers Purvis, Coyne and Corcoran, a copy of which was sent to the District Attorney's office prior to trial.

7. A pretrial conference was held three days prior to trial. This conference was attended by members of the homicide squad, Patrolmen Heagy and Dubis, and a number of witnesses.

8. Heagy testified that at this conference he gave to Strauss a detailed description of the relator's appearance at the time of his arrest and the events that transpired afterward. Heagy further testified that he told Strauss that relator was in a crazed condition and insane. He testified that he repeated the foregoing to Strauss in the hall of the courthouse while the trial was in progress.

9. Strauss denied that this officer had ever said anything to him which indicated that the relator was irresponsible and he denied that the officer had given him a detailed description of the relator's appearance and condition.

10. There is no evidence that any one heard Heagy so inform Strauss at the hearing or at any other time prior to or during trial.

11. Both gentlemen are respected public servants of many years standing and undoubtedly both were testifying to their best recollection of what had occurred.

12. Mattie Spells attended the pretrial conference and told Strauss that when the defendant came to her home after the killing he did not recognize her; that his eyes were glassy and he acted as if doped or drunk.

13. The prosecuting attorney and the prosecuting officers had reason to believe from eyewitness accounts of the slaying that the relator at that time was in full control of his physical and mental faculties.

2. Raleigh Pleasant, George Holmes. James Mayfield testified at the first habeas corpus hearing that he thought relator was crazy.

3. Loice Spells, Lovie Spells, Mattie Spells and Katherine Smith.

4. Patrolman Lippi. Patrolman Heagy concluded at the hearing on the present petition that relator was in a crazed condition and insane.

810

The actions of the relator, as portrayed by the eyewitnesses at the trial, were those of a vicious and merciless killer bent on revenge or robbery or both, who knew exactly what he was doing and how to do it. It was this condition of the relator of which the prosecutors were acutely aware prior to the trial, and the conclusion of Officer Heagy that the relator was in a crazed condition three or four hours after the shooting, assuming that it was related to those in authority, was not competent nor sufficiently impressive to change the prosecution's theory of the case. Likewise, the statements and conclusions of Mattie Spells, to some extent a hostile witness, could not be expected to make much of an impression at the pretrial. The conclusions of these laymen under the circumstances could not be regarded as competent, important or material, and did not cause the prosecutors to suspect excessive intoxication, or remotely suspect insanity on the part of the relator at the time of the killing.

14. The arresting officer, Dubis, was called as a witness for the reason that he had his initials on the murder weapon and cigarettes found on the relator's person. At the trial Dubis testified that he and Officer Heagy were together when the arrest was made. He mentioned Heagy's name three times (204a). Officer Purvis mentioned it once (194a).

15. Although Heagy's identity had been disclosed at the trial and he had been in court during most of the trial, neither the relator nor his counsel questioned him. It was not known to relator or his counsel until on or about June 1, 1953, that Heagy would have stated that relator was in a crazed condition or insane at the time of the arrest.

16. Officer Heagy was summoned for the Grand Jury and for the pretrial conference and for the trial. He was not called as a witness before the Grand Jury or at the trial. He attended the sessions of the trial which lasted five days. He did not attend a night session because he asked to be excused. He did not hear Dubis testify.

17. Patrolman Heagy's name was not endorsed on the indictment, but his name was not deliberately omitted therefrom in order to conceal his identity.

18. At the conclusion of the Commonwealth's case, the Assistant District Attorney notified the defense that Sue Horton, "a woman whose name has been mentioned," was present in court, and certain "witnesses whose names appear on the indictment and who have not been called by the Commonwealth are available, or will be made available by the Commonwealth to the defense if they should see fit to call them." The witnesses named by Mr. Strauss did not include Patrolman Heagy, but his name was not deliberately omitted in order to prevent the defense from calling him.

19. There is no competent evidence that relator was insane on the day of the killing.

20. The prosecuting officers of the Commonwealth of Pennsylvania did not willfully and deliberately withhold or suppress evidence beneficial to the relator.

Discussion

Under the facts as found by the court, it becomes clear that the prosecuting officers of the Commonwealth of Pennsylvania did not suppress evidence beneficial to the relator, Cleveland Thompson, prior to or during his trial. The most that can be said is that they were not assiduous in ferreting out and calling as witnesses persons such as Katherine Smith, Loice and Lovie Spells, and Paul Lippi, whose testimony was of doubtful competence, importance, relevance or materiality in view of the Commonwealth's theory of the case. They did subpoena and call Mattie Spells, who was to them obviously a hostile witness, and who testified that the relator acted as if he were under the influence of dope or something.

■ In view of the eyewitness accounts of the killing, evidence of the subsequent actions of the relator, which indicate a quarrelsome degree of intoxication, would appear irrelevant and immaterial to any district attorney with a first degree murder case on his hands, no matter how fair he was. We think Strauss' conduct of the trial was consistent with the rights every

defendant may reasonably expect under the law of Pennsylvania.

■ Patrolman Heagy had been mentioned in the testimony and was available. Officer Purvis was called and was subjected to cross-examination, as were the witnesses Giles,[5] Richardson, Mattie Spells and Officer Dubis. It was undoubtedly the relator's burden to produce witnesses who would have testified to his condition if he thought their testimony was admissible to corroborate his own. It was his burden to establish the defense of intoxication[6] and his failure so to do cannot be shifted to the prosecution. In this connection the relator was not a stranger in Pittsburgh, but had lived in and out of Pittsburgh since 1937, and was well acquainted with Loice and Lovie Spells and Katherine Smith, his landlady.

■ After careful analysis of the present petition and the evidence presented before this court, we are of the opinion that the relator is trying to shift the alleged delinquencies of his defense counsel to the prosecuting attorney and thus convert into the responsibility of the state that which we previously held was not the responsibility of the state. See United States ex rel. Thompson v. Dye, D.C., 103 F.Supp. 776.

Relator's counsel have stated that they "lean heavily" on the decisions of the District Court and Court of Appeals in United States ex rel. Almeida v. Baldi, supra. That case is clearly distinguishable on its facts. In the Almeida case, Judge Welsh found that the prosecuting officers willfully and deliberately suppressed material physical evidence which was in the possession of the police. The Assistant District Attorney in that case, when asked, denied that there were any other bullets and further it was found that he told certain police officers at the subsequent trial of a codefendant not to mention the bullet so as to suppress knowledge of its existence. There is no allegation in the case sub judice that the Assistant District Attorney told any one to suppress evidence. All the evidence, in fact, is to the contrary.

The difference between the Almeida case and the instant case is that in the Almeida case the court found that there was active suppression of evidence, whereas in the instant case the most that can be said is that the prosecuting officers did not actively assist relator in preparing his defense.

■ We do not find that in this case the failure to probe for evidence helpful to a defense of insanity or the failure to gather and turn over certain other evidence which would strengthen the defense amounts to a suppression of evidence or a denial of due process.

Petition denied.

### Conclusions of Law

1. Relator has exhausted his state court remedies.

2. The court has jurisdiction of the matter.

3. The prosecuting officers of the Commonwealth of Pennsylvania did not willfully and deliberately withhold or suppress evidence beneficial to relator.

4. The relator was accorded a fair trial in conformity with the concepts of due process.

5. The petition for a writ of habeas corpus is without merit and will be denied.

---

5. Giles was present in the barroom when the relator was arrested, and testified at the trial.

6. Commonwealth v. Chapman, 1948, 359 Pa. 164, 58 A.2d 433.