Otis Ray FITZGERALD, Petitioner-
Appellant,

v.

W. J. ESTELLE, Director Texas Depart-
ment of Corrections, Respondent-
Appellee.

No. 72–2459.

United States Court of Appeals,
Fifth Circuit.

Dec. 30, 1974.

Rehearing Denied Feb. 12, 1975.

John L. Jeffers, Jr., Houston, Tex. (Court-appointed), for petitioner-appellant.

John L. Hill, Atty. Gen., Austin, Tex., W. Barton Boling, Asst. Atty. Gen., El Paso, Tex., for respondent-appellee.

Before BROWN, Chief Judge, and RIVES, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

CLARK, Circuit Judge:

A panel of this court overturned a finding by the Texas trial and appellate habeas corpus courts and by the federal district judge that petitioner had not been denied the effective assistance of counsel at his 1954 state court trial for robbery. We agreed to rehear the cause en banc to resolve the constitutional standards which govern adjudication of claims of ineffective assistance of privately retained counsel. Those standards are set out as Part I. After a review of the records of the original trial we reverse the panel action and affirm the denial of habeas corpus relief for the reasons set out in Parts II and III.

I.

Two distinct lines of authority have developed in the circuit as to the constitutional standards by which to adjudicate claims of ineffective assistance of privately retained counsel. In one, the court holds that the effectiveness of representation by both retained and appointed counsel must be gauged by the same measure. These cases do not reason the necessity for state involvement. *See* Porter v. United States, 298 F.2d 461 (5 Cir. 1962); Bell v. Alabama, 367 F.2d 243, 247 (5 Cir. 1966), and Holland v. Henderson, 460 F.2d 978 (5 Cir. 1972); *see also* Breedlove v. Beto, 404

F.2d 1019, *n.* 1 (5 Cir. 1968) and Judge Rives dissent in Langford v. Alabama, 422 F.2d 760 (5 Cir. 1969). The other series of authorities do not discuss the legal gauge for minimum effectiveness. Their analysis stops at the no-state-action level. These cases refuse to attribute counsel's action to the state per se, and require actual or constructive knowledge of ineffectiveness, or participation by the prosecutor or the trial judge, to meet the Fourteenth Amendment's threshold state action requirement. *See* Howard v. Beto, 375 F.2d 441 (5 Cir. 1967); Johnson v. Smith, 447 F.2d 985 (5 Cir. 1971) (Rule 21); Langford v. Alabama, 422 F.2d 760 (5 Cir. 1969), and McGriff v. Wainwright, 431 F.2d 897 (5 Cir. 1970). *See also e. g.,* King v. Wainwright, 368 F.2d 57, 59 (5 Cir. 1966); Burkett v. Mayo, 173 F.2d 574 (5 Cir. 1949).

■ Although no attempt at harmonizing these lines has been previously made, they are not necessarily at odds. Our reconciliation stresses the importance of recognizing the constitutional framework upon which the particular claim of ineffective assistance of counsel in a state court is to be based. The first question to be asked must be whether the case involves the Fourteenth Amendment due process clause standing alone, or the Sixth Amendment right to counsel incorporated in Fourteenth Amendment due process.[1] The conviction of a defendant after a trial that is fundamentally unfair, whatever the cause of such unfairness, violates Fourteenth Amendment due process. *See e.g.,* the mob domination cases: Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915) (Holmes, J., dissenting), and Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923); the conviction of an accused person while he is legally incompetent: Pate v. Robinson, 383 U.S. 375, 377, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); and a conviction predicated upon no evidence at all: Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Whenever a defendant has been convicted as the result of such a gross malfunction, the result is that the state's criminal justice system has operated to deny due process. Requisite Fourteenth Amendment state action is present, not because a state official knew the particulars of the unfairness or because retained counsel is deemed a state official, but because the system has failed, and the state's consequent imprisonment or fine of the defendant is fundamentally wrong.[2] In the same manner, whenever a lawyer's ineffectiveness has rendered a trial fundamentally unfair, whether he be retained or appointed and whether his action or inaction was known or unknown to state trial officials, a deprivation of Fourteenth Amendment due process results from enforcement of the resultant judgment.

■ Moving from the Fourteenth Amendment alone to the incorporated Sixth, our decisions establish that the standard of reasonably effective assistance of counsel, most recently delineated in Herring v. Estelle, 491 F.2d 125 (5 Cir. 1974), covers a greater range of counsel errors than does the fundamental fairness standard of the due process concept solely embodied within the Fourteenth Amendment. The circumstances in which the state will be bound by retained counsel's failure to meet the Sixth Amendment standard of effective-

---

1. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

2. Porter v. United States, *supra,* from the first line of decisions, is a good example of this type of case. There the attorney retained by the defendant represented conflicting interests. His allegiance to the defendant was divided by his attempt to protect an adverse witness in another proceeding. Holland v. Henderson, *supra,* involved facts similar to *Porter.* In Bell v. Alabama, *supra,* the petitioner averred that his counsel induced him to present no defense at all and that his "trial" consisted only of an appearance in court, an "introduction to the jury" and the pronouncement of a 25-year sentence.

ness (when the resulting trial cannot be characterized as fundamentally unfair) must be assessed more strictly lest we place a procedurally intolerable and practically impossible burden upon trial judges, who have no control over the selection of counsel employed by a defendant. The only reasonable judicial checkrein—questioning of the tactics and strategy of retained counsel throughout a trial—would freight the bench and bar alike and many times would be counterproductive for the defendant. Without such interrogation of the defendant's lawyer, the court could never know whether his actions or inactions were deliberate or forgetful, brilliant or inept.

■■ To find state involvement in retained counsel's conduct which is adjudged to be less than reasonably effective, yet not so grossly deficient as to render the proceedings fundamentally unfair, it must be shown that some responsible state official connected with the criminal proceeding who could have remedied the conduct failed in his duty to accord justice to the accused. That the trial judge and the prosecutor have such a capacity and duty is unquestionable. Therefore, if the trial judge or the prosecutor can be shown to have actually known that a particular defendant is re-

ceiving incompetent representation and takes no remedial action, the state action requirement is satisfied. If they directly participate in the incompetency, it is even more so. Furthermore, if the incompetency of a retained attorney's representation is so apparent that a reasonably attentive official of the state should have been aware of and could have corrected it then again the state action requirement is satisfied.[3]

■ We agree with Judge Godbold that the ultimate contention in cases such as the instant one is that because a defendant's counsel was ineffective his trial was unfair and thus violative of Fourteenth Amendment standards. However, his conclusion that the Fourteenth Amendment state action requirement is satisfied in every ineffectiveness of retained counsel case "because the state adjudicatory machinery is inextricably intertwined with the conduct of an accused person's retained attorney" reaches far too far. By making every action of a counsel chosen by the defendant that of the state, his reasoning places under the control of defendant or his selected attorney or both, the power to abort the proceedings by design as well as neglect. Popeko v. United States, 294 F.2d 168 (5th Cir. 1961).[4]

3. The factual situation in most of the second line of cases set out above are not detailed in the court's opinions. To the extent that such factual situations could stand for the rationale that even retained counsel action which rendered the trial fundamentally unfair could not be reached absent some showing of state knowledge or participation, those cases are here overruled.

4. Putting to one side the fact that the district judge had the right to and did determine, in denying the motion for new trial, that the defendants had not shown that they had any material witnesses who would have been of assistance to them and whose names they gave their trial counsel and that they had refused to call them, we think it basic to the claim of relief, since defendants were represented by their own employed trial counsel, that they may not assign as error that the mistakes or errors of their counsel constituted an unfair

trial, and that, without a showing of a deliberate purpose on the part of counsel to prevent defendants from obtaining a fair trial, or action so grossly negligent as to amount to substantially the same thing, the defendants cannot relieve themselves of the errors, mistakes or misjudgment of their counsel by having the trial set aside. To read the Sixth Amendment, with its provision that the accused shall have the assistance of counsel for his defense, as requiring a different view would be to defeat and destroy it because, by relieving defendants of responsibility for the errors and mistakes of their chosen counsel by making them the occasion of defeating and avoiding a trial, would be to put a premium on incompetent and inefficient counsel whose mistakes could be more certainly relied upon as effective aid for reversal than the sound and competent advice and trial conduct of the most efficient counsel.

In sum, whenever the actions of retained counsel operate to deprive the trial of fundamental fairness then the Fourteenth Amendment due process had been violated notwithstanding any kind of specific involvement by a particular state official. If a retained counsel's actions do not sap the proceedings' fundamental fairness, but are challenged as less than reasonably effective in violation of the Sixth Amendment, state involvement through actual or constructive awareness of the error by the judge, prosecutor, or other responsible official who could have corrected it, must be shown. In the instant case the testimony of the district attorney that he considered Fitzgerald's counsel to be ineffective dictates that their conduct be tested by the standards of Herring v. Estelle, *supra*.

## II.

■ The parameters of federal judicial power to grant habeas corpus relief to a state prisoner are fixed by Congressional edict. Not only is exhaustion of state remedies required [28 U.S.C. § 2254(b)], but duly made and fairly supported factual determinations in state proceedings must be presumed to be correct if based upon a full, fair and adequate hearing [28 U.S.C. § 2254(d)]. The District Court of Anderson County, Texas, Third Judicial District, held the only evidentiary hearing in this cause. Since no question has been raised as to the fullness, fairness or adequacy of that proceeding,[5] to reverse, we must find the record developed does not fairly

support the factual determination of that court.[6]

Literally using the words of our decision in MacKenna v. Ellis, 280 F.2d 592 (5th Cir.), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1960), the Third District Court held Fitzgerald's retained attorneys, Martin and Shown, were "reasonably likely to render [and did render him] reasonably effective assistance" on the occasion of his questioned 1954 trial and appeal. When the underlying facts and circumstances of this proceeding are realistically viewed we find this determination is compelled, rather than merely "fairly supported." Fitzgerald employed these lawyers himself and never complained of their representation for seventeen years. The panel's holding that they so conducted their representation as to deprive him of assistance of counsel for his defense results from placing undue reliance upon the recollections of a prosecutor who now testifies he feels that a man he convicted twenty years ago received too harsh a sentence.

While the background and details set out in the panel's opinion, 479 F.2d 420, are not recited incorrectly, the fact development fails to include several significant matters. A look at the whole picture demonstrates that the prosecution had an open and shut case on proof of what occurred, and that Fitzgerald's only defense to the grand jury's indictment for robbery by assault[7] was purely legal—that taking the jail keys during an escape did not change the crime of escape to the crime of robbery. Fitzger-

---

When a defendant selects his own counsel, the counsel truly represents the defendant, and no mistake or error of his, made in good faith and with an earnest and honest purpose to serve his client, can be made the basis of a claim of reversible error. (294 F.2d at 171)

5. At the habeas corpus hearing in Anderson County, Texas both Fitzgerald and the former District Attorney testified. Fitzgerald's former attorneys, Martin and Shown, were both dead. The original trial judge did not preside. The transcript of the criminal trial

was introduced. No other witnesses were sought. No tendered proof was refused.

6. This determination was affirmed by the Court of Criminal Appeals of Texas based on said District Court findings, without written appellate court order. Application No. 3443, September 23, 1971.

7. Even without enhancement by a prior conviction, this crime carried a potential for punishment by imprisonment for a period from life to any term of years not less than five.

ald's attorneys fully developed and adequately presented this single legal issue to the Texas Court before and after the trial. It was the principal point they urged for reversal in the Court of Criminal Appeals and was the sole focus of the surprising opinion rendered on the direct appeal by that court.

[8] On December 22, 1953, Otis Ray Fitzgerald and his wife went to the Anderson County jail to make an accident report. Unbeknown to the luckless Fitzgerald, the Sheriff then held a warrant for his return to custody as a parole violator. Accordingly, the Deputy Sheriff on duty placed Fitzgerald under arrest, but did allow him to make a call. He telephoned attorney Shown in Houston, Texas, who had been retained by him since November 1953 in connection with a prior unrelated criminal charge in Houston.[9] Fitzgerald was then in a first floor holding cell. When the officers returned to transfer him, Fitzgerald, using a gun he had kept concealed at the time of his jailing, got the drop on them and made his escape by locking Evans in the cell and taking the cell door keys with him. The next legal shock for Fitzgerald came when the January 1954 grand jury, acting at the behest of the District Attorney, indicted Fitzgerald—not for escape or threatening the officers with a gun, but for robbery of two jail keys.

At the time this indictment was handed down and at the time of Fitzgerald's trial, Texas legal precedent indicated the charge stood on the thinnest of legal ice, if indeed it was not improper. In Bailey v. State, 139 Tex.Cr.R. 260, 139 S.W.2d 599 (1940) the court reversed a robbery conviction in which a prisoner assaulted a jailer, took the keys to his cell and placed them under his cot inside the cell. In the course of its opinion refusing rehearing, the court stated:

> Robbery is but an aggravated species of theft. If property is taken for a mere temporary use, then it is not theft. There must be an intent to permanently appropriate the property and to deprive the owner thereof of its value.
>
> What was the object of appellant in forcibly taking the keys from the jailer? Was it to permanently appropriate the same? If so, of what use could they be to him except to liberate himself and make his escape? Did he desire to release himself from confinement or was it his purpose to permanently appropriate the keys? They were of no value to any one except to the jailer who could use them for the purpose and only the purpose for which they were made. Which is the most natural and logical conclusion to be drawn from the facts and circumstances disclosed by this record? A person's desire to enjoy liberty is certainly much greater than his desire to permanently appropriate the keys which he could not put to any other use except to liberate himself from confinement.

Bailey v. State, supra, 139 S.W.2d at 600.

Evans and three other witnesses testified as to the facts of the assault, the jail break and the key-taking both before the grand jury in January 1954 and when the robbery trial was held on March 22, 1954. This abundance of fresh, eyewitness proof as to the details of what occurred is related to emphasize that the State lacked no modicum of proof of how the assault and robbery occurred. If it be considered less than totally persuasive, then the words of the District Attorney, whose testimony as petitioner's witness on the habeas hear-

---

8. In the interests of cogency, the following recitation of the full context of Fitzgerald's trial and post-conviction proceedings repeats some of the matters included in the panel opinion.

9. Fitzgerald was no neophyte criminal defendant. At the time of this trial for robbery he had entered three prior pleas of guilty to offenses in Waco and Denton, Texas and Tucson, Arizona.

ing provided the impetus for the panel's factual assumptions of incompetency, should be poignantly sufficient to make the point:

Q Why did you proceed with the prosecution of Mr. Fitzgerald if you had doubts about his being guilty of the charge?

A Because, as I have told you, under the law as it existed at that time, I thought that—I was not sure that he was guilty of the offense of robbery by assault, because of the asportation question, which was involved and—but you know you get to a point where cases have to be tried and then it becomes the duty of the Court of Criminal Appeals in Austin, that's what they're down there for, is to decide whether or not we tried the case correctly and properly in the trial courts; we went ahead and tried the case with the law in the state of doubt that I found it in.

Q Did you tell the Court during Mr. Fitzgerald's trial you weren't sure he was guilty?

A No, but I told the Court, and both the Court and myself were not sure of the law.

\* \* \* \* \* \*

A *I would have almost bet you a hundred dollar bill that the case was going to be reversed and rendered.* (Emphasis supplied)

To add insult to injury, Fitzgerald was not only tried on the legally tenuous charge of robbery by assault, but the District Attorney had included an enhancement count based on a prior robbery conviction. During the course of the trial, the District Attorney advised Lawyers Martin and Shown that the

case would have to be continued for an extra day to permit the arrival of a witness from McLennan County to prove that the Otis Ray Fitzgerald then on trial, was the same person as the Otis Ray Fitzgerald who had been convicted of robbery there six years and nine months before. Although the record is not altogether free from ambiguity, the most plausible reading of the prosecutor's testimony as to this incident discloses that he only apprised his opponents of the probable delay and that he never communicated to Martin and Shown his personal doubts that the witness whose appearance would necessitate the delay might have difficulty in identifying Fitzgerald.[10] Certainly the state habeas court could have concluded from a fair appraisal of these statements that the need for delay was all that was communicated. At some point after this communication Martin and Shown decided to put Fitzgerald on the stand to admit this fact. While it provoked the opprobrium of the panel, the state and federal district habeas forums did not consider this action so malevolent. Even in hindsight, a fair appraisal could regard it as a permissible tactical decision by a retained lawyer who does not know the proof is tenuous, who is interested in eliminating unnecessary expense to his client, who regards his defense as purely legal, and, most importantly, who knows the delay-causing item of proof is the gospel truth.

The thirty-eight page trial transcript reflects that twenty objections were made by Martin and Shown during the course of the case's development and that seventeen of these were sustained by the trial court.[11] Such cross-examina-

10. After his testimony which is quoted in the panel opinion, 479 F.2d at 422–423, this colloquy with him appears in the record:

Q Now, to be sure I understood what you said a moment ago about this matter, this possible witness from McLennan County, did I understand correctly that you told the attorneys, Shown and Martin, that the case would have to go over another day for you to get your witness

here from McLennan County and they elected to put Otis Ray Fitzgerald on the stand and testify to those facts, rather than spend another day in Anderson County?

A Yes, sir, they wanted to get the case over with that day.

11. One objection concerned the validity of the McLennan County conviction because of a variance in dates. This was overruled.

tion as was possible was duly conducted. At the close of the prosecution's case attorneys Martin and Shown moved the court to instruct a verdict of acquittal. This motion was denied. They took numerous exceptions to the court's charge to the jury and all were denied. Most noteworthy is the following exception to the court's failure to charge the precise rationale of Bailey v. State, *supra*:

> "Because the Court nowhere instructs the Jury in the following manner, to wit:
>
> Now if you should believe from the evidence that the defendant did, by putting Floyd Evans in fear of life and bodily injury, take from the person and possession of Floyd Evans two metal door keys, but you should further believe that the defendant took said door keys for the purpose of and with the intent to use said keys to enable him to escape from jail and for temporary use for that purpose or if you should have a reasonable doubt that at the time he took said keys he had the specific intent to permanently deprive the said Floyd Evans of the use of such keys you will acquit the defendant and say by your verdict not guilty and this too even tho the defendant, after taking such for temporary use or with the intent to use them temporarily, he did carry the keys away with him; for, the intent to steal the keys, that is to permanently appropriate them to his own use, must, in order to constitute him guilty of robbery have existed in the mind of the defendant at the very time of the taking of the keys from the possession of Floyd Evans, even tho the defendant may have, after

such taking formed the intent to, and did steal such keys".

After his conviction, Fitzgerald's counsel moved the court for a new trial and when this was overruled they gave immediate notice of appeal. The right to appeal in forma pauperis was secured and Martin and Shown continued to represent Fitzgerald in the appellate forum.

The ultimate legal shock came at the hands of the Texas Court of Criminal Appeals when that court upheld the conviction by distinguishing *Bailey* on the grounds that Fitzgerald kept the keys with him rather than hiding them at the jail, thus showing that he perpetrated the robbery with the intention of appropriating the jail keys and depriving the jailer of their value! Alternatively, the court held that to the extent anyone might consider this distinction to be inadequate *Bailey* was overruled. 160 Tex.Cr.R. 414, 271 S.W.2d 428 (1954).

Following this appellate misadventure, Fitzgerald served his sentence without any attempt to evoke relief from his imprisonment. He remained in continuous custody for over thirteen years. He then spent almost the next four years on parole, before being returned to custody for an alleged parole violation. Several months of this latest incarceration had passed before he first sought habeas relief. By this time both of his former attorneys were dead. Even then, his pro se petition challenged the actions of his attorneys *only* for an asserted failure to advise him that the district attorney had offered to recommend a ten-year sentence in exchange for a plea of guilty.[12]

The prosecutor's aspersions and demeaning comments about his deceased colleagues,[13] which so impressed the pan-

---

On appeal the State's attorney confessed that this ruling constituted reversible error under Goodale v. State, 146 Tex.Cr.R. 568, 177 S.W.2d 211 (1944), but urged the court to reverse *Goodale* as unsound. The appellate court did not mention the point in its affirmance. Fitzgerald's counsel urged the issue in a motion for rehearing but this was denied without opinion.

12. Fitzgerald's petition also challenged the validity of his parole revocation. The panel

and en banc court decline to reach this point. An amended petition prepared by an appointed counsel added to the competency of counsel allegations a charge that Fitzgerald's lawyers had promised him that the trial judge would direct a judgment of acquittal.

13. "Judge Martin was an elderly man, seventy or eighty years old and I believe he had acquired the title of judge by reason of the fact he had been a county judge of some lit-

el, either were not credited by the trial court or were considered beside the mark on the question of incompetence. We find either possible construction fairly supported by the record.[14]

*If* the District Attorney had been staunch enough in the face of pressure from embarrassed officers who had become victims of their own prisoner, Fitzgerald might never have been indicted for robbery. *If* the District Attorney had told Martin and Shown that his identification witness was unsure, they might have refused to have Fitzgerald admit identity and the witness might have failed to pick out Fitzgerald. *If* the sentence had not been enhanced, the jury might have fixed Fitzgerald's punishment at less than life imprisonment. *If* the trial judge had granted Martin and Shown's requested charge, the jury might have acquitted Fitzgerald. *If* the appellate court had not given *Bailey* such a narrow interpretation or alternatively changed the law, the conviction might have been reversed. *But,* none of these "might-have-beens" came to pass.

■ The sole issue in this cause was never a jury issue. It always was a question of Texas law. The panel erred when it shifted the blame for Fitzgerald's sentence from the vagaries of that law to an unsupported speculation that two retained attorneys, who are no longer able to defend themselves, incompetently defended him. In the face of contrary fact determinations fairly supported by an adequate hearing record this surmise not only violated congressional mandate embodying the standards of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), it went

against prior precedent of this court which proscribes appellate fact finding and second-guess reappraisals of counsel actions. A holding that Fitzgerald's counsel were incompetent in their *Bailey* defense would be diametrically contrary in substantive result to our reversal of Herring v. Estelle, *supra*, which adjudged Herring's lawyer incompetent because he failed to apprise his client that his temporary use of keys in a Texas jail break "could not be construed as robbery" in light of *Bailey*.

We affirm the district court's determination that Fitzgerald's retained counsel were not ineffective.

### III.

■ Our conclusion that Fitzgerald's counsel were not ineffective necessitates deciding his remaining claim, not reached by the panel, that the revocation of his parole without a hearing violated his right to due process guaranteed by the Fourteenth Amendment. He admits that he did not request that a hearing be held, a prerequisite under the Texas statute and regulations,[15] but explains that because of his lack of legal knowledge he was unaware that he had a right to request a hearing. The court below dismissed this contention on the basis of this circuit's decision in Loper v. Beto, 440 F.2d 934 (5th Cir. 1971), vacated on other grounds, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972).

Fitzgerald acknowledges that the Supreme Court's decision in Morrisey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which established the holding of a hearing prior to revocation of parole to be compelled by mini-

---

14. The prosecutor denied seeing Martin or Shown drink any alcohol. While Fitzgerald testified he smelled alcohol on his lawyers' breath when they talked with him in the jail before the trial commenced, he further stated he did not later detect the odor in the courtroom. He testified that his attorney had been handling another case in Oklahoma City and had traveled all night to get to his trial site.

15. Vernon's Ann.C.C.P. art. 42.12 § 22; *see* Ex parte Lewis, 170 Tex.Cr.R. 254, 339 S. W.2d 900 (1960).

tle county out in West Texas."; "Col. James Shown . . . was . . . fifty-five or sixty years old and an obese man, he sweated profusely . . ."; " . . . they were unkempt."; "Not very well groomed . . ."; " . . . they smelled of strong drink; you could detect alcoholic beverages on the breath of both gentlemen."; " . . . how recent it was, I do not know,"; "neither attorney ever had any formal, legal training."; "Honestly, I would say I was not impressed with their ability . . .."

mal requirements of due process, was to have prospective application only, and cannot serve to supply the necessary constitutional violation to his pre-*Morrisey* claim.[16] He adopts instead the observation in *Loper* that the State of Texas, having provided by statute for the right to a prerevocation hearing, must accord the benefits of that right equally to all parolees in similar circumstances. 440 F.2d at 941. He suggests that the State's justification for denying him a hearing—his failure to request one—constitutes an arbitrary exercise of the state's power in violation of the Equal Protection Clause. He contends therefore that Texas had the burden to prove his omission was an intentional relinquishment of a known right under the standard announced in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Since Fitzgerald's testimony that he did not request a hearing because he did not know he had a right to do so was undisputed, he concludes that a finding of waiver was impermissible, wherefore revocation without a hearing denied him due process.

Neither the equal protection nor due process arguments can withstand close scrutiny. The deprivation of equal protection envisioned in *Loper* did not extend to parolees who did not ask for a hearing. "Failure to afford a hearing *on a legitimate request* in circumstances and under facts which meet the requirements and provisions of the Texas statute might deprive a parolee of 'equal protection' of the state law, a right guaranteed by the appropriate provision of the Fourteenth Amendment." 440 F. 2d at 941 (emphasis added). Fitzgerald has adduced no evidence to show that he has in any way been treated differently from other parolees similarly situated. His unarticulated complaint must be that by providing a prerevocation hearing only upon request Texas has arbitrarily divided parolees into two classes —those who are aware of their right to a hearing and those who are not—and effectively denied to those in one class

the benefit of the statute. To remedy this alleged defect State authorities would have been required to notify each parolee subject to revocation of the right to a hearing upon request, or they would have been required to accord a hearing in every revocation proceeding. Such a contrived attack stands the statute and implementing regulations on their head. It has the equivalent effect of raising the right to a prerevocation hearing to a constitutional level. The pre-*Morrisey* law is to the contrary.

Finding that Fitzgerald's claim to ignorance of his rights raises no federal constitutional issue also defeats his waiver argument. Clearly, if the underlying right had been conferred by the United States Constitution, the Johnson v. Zerbst standard would apply. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L. Ed.2d 837 (1963). Here, however, no constitutional right was involved, and the holding that a purely state-created right has been waived raises no federally cognizable question. United States ex rel. Payton v. Rundle, 472 F.2d 36 (3d Cir. 1972).

We conclude that the failure to afford a prerevocation hearing to Fitzgerald in the absence of a request was not arbitrary and did not constitute a denial of equal protection or due process, even if he failed to invoke this state-created right as a result of ignorance.

The denial of habeas corpus relief is

Affirmed.

LEWIS R. MORGAN, Circuit Judge, with whom THORNBERRY, Circuit Judge, joins (concuring in part and dissenting in part):

I would associate myself with Part I of the En Banc opinion of Judge Clark which would resolve the constitutional standards for the adjudication of claims of ineffective assistance of privately retained counsel.

Because I believe that Fitzgerald did not receive effective assistance of counsel, however, I would adhere to the orig-

---

16. *See* Rose v. Haskins, 388 F.2d 91 (6th Cir.), cert. denied, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968), for a review of pre-Morrisey authorities.

inal panel ruling * granting him habeas corpus relief.

GODBOLD, Circuit Judge with whom BROWN, Chief Judge, and RIVES, WISDOM and GOLDBERG, Circuit Judges, join, (concurring in part and dissenting in part).

I am glad to see even partial dissipation of the anomaly of different constitutional consequences from ineffectiveness of retained counsel and ineffectiveness of appointed counsel in criminal cases. Torn between this distasteful anachronism on one hand and the concept of state action on the other, and with two competing lines of authority in this circuit, the majority stake out a new but intermediate position. I would go the whole way and hold that the due process clause of the Fourteenth Amendment assures a criminal defendant effective representation of counsel whether the attorney is court appointed or retained.

### 1. Fourteenth Amendment due process, with and without incorporation

None will disagree with Judge Clark's statements that fundamental unfairness in the state trial of a criminal defendant violates Fourteenth Amendment due process. In a case where the fundamental unfairness complained of is ineffectiveness of counsel, the ultimate contention is that because the defendant lacks the essential tools for defense his trial is unfair and thus lacking in the due process guaranteed by the Fourteenth Amendment. See Craig, The Right to Adequate Representation in the Criminal Process: Some Observations, 22 S. W.L.J. 260, 272 (1968), quoted by Judge Wisdom, writing for this court in West v. Louisiana, 478 F.2d 1026 at 1033 (5 Cir. 1973); Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv.L.Rev. 1434, 1437 (1965).

Judge Clark, however, draws a distinction between cases which involve the due process clause "standing alone," that is, without incorporation of Sixth Amendment right to counsel, and cases in which the Sixth Amendment right is incorporated into Fourteenth Amendment due process. He considers that cases of the latter type cover a greater range of counsel errors than does the fundamental fairness standard of the due process clause as solely embodied within the Fourteenth Amendment, but in these latter cases he is willing to find due process applicable to only the situation in which some responsible state official connected with the criminal proceeding who could have remedied the conduct failed in his duty to accord justice to the accused. This distinction coincides remarkably with the rationale of the Supreme Court in Betts v. Brady, 316 U.S. 455, 465, 62 S.Ct. 1252, 1257, 86 L.Ed. 1595, 1603 (1942):

> Though, as we have noted, the [sixth] amendment lays down no rule for the conduct of the states, the question recurs whether the constraint laid by the amendment upon the national courts expresses a rule so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment.

That distinction was met forthrightly and repudiated in Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799, 804 (1963):

> We accept Betts v. Brady's assumption, based as it was on our prior cases, that a provision of the Bill of Rights which is 'fundamental and essential to a fair trial' is made obligatory upon the States by the Fourteenth Amendment. We think the Court in Betts was wrong, however, in concluding that the Sixth Amendment's guarantee of counsel is not one of these fundamental rights.

Thus in *Gideon* the Supreme Court established that the Sixth Amendment's guarantee that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense" is fundamental and essential to a fair trial. Chapman v. California, 386 U.S. 18, 23, note 8, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 710 (1961), indicates that since *Gideon* the Sixth Amendment right to counsel is

* Fitzgerald v. Beto, 479 F.2d 420 (5 Cir. 1973).

one of those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error". *Cf.* Cupp v. Naughten, 414 U.S. 141, 155, 94 S.Ct. 396, 404, 38 L.Ed.2d 368, 378 (1974), Brennan, J., dissenting, joined by JJ. Douglas and Marshall; 3 Wright, Federal Practice and Procedure, § 855.

There may be cases in which the defendant and counsel fraudulently collude, or in which the defendant purposely retains incompetent or inefficient counsel. With the exception of such cases, which must be rare, it would seem clear that by retaining his own counsel, the defendant does not lose his constitutional right to have the effective assistance of counsel for his defense. Indeed, in most cases the defendant is attempting to implement that right. One who, perhaps at some sacrifice, employs his own attorney should not be penalized by having a lower standard applied to measure his constitutional right to the assistance of counsel or by the requirement of some state involvement in addition to that which results from enforcement of the judgment.

## 2. State action

Where counsel is retained, the necessity for state action is satisfied because the state adjudicatory machinery is inextricably intertwined with the conduct of an accused person's retained attorney. Thus I view the case as comparable with Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), in which the Supreme Court held that state action was supplied by the involvement of the state adjudicatory machinery in enforcement of ostensibly private racially restrictive covenants. See also Hall v. Garson, 430 F.2d 430 (CA5, 1970) (state action found where private individual performed function traditionally performed by sheriff upon order of the court).

The adjudication of state criminal cases is a vital function of the state in the performance of which it structures, operates and regulates an intricate and powerful arm of government. It provides for judges, sets their pay and qualifications and designates their mode of selection, and, if the method is electoral, supervises it. The state furnishes the physical facilities and court functionaries and provides for selection, summoning and paying jurors. From arrest to ultimate release, and even afterwards on probation or parole, the accused is at least to some degree in the hands of this system. The lawyer, appointed or retained, is a crucial part of the adjudicatory machinery; indeed, since Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), he has been not merely important but essential in more serious cases.[1] Unless his aid is knowledgeably waived, the proceedings cannot validly take place without him.

While the state does not select the retained lawyer as it does the appointed counsel, it selects and controls the class from which he is drawn. It admits him to practice, and particular courts can bar him. We recognize the lawyer's special status in an informal manner by referring to him as an "officer of the court." Frequently the courts accept as true his representations, and at times even his testimony, without the necessity of his taking the usual witness' oath. The prosecutor and the court, within bounds, command his presence and direct his timetable by deciding when to go forward with the case against his client. The form and order of his pleadings are closely prescribed by the state. State procedural rules govern his decisions in such critical matters as the necessity of giving advance notice of certain defenses and of making certain objections in order not to waive them. The fact that as advocate and counsel the lawyer is obligated to serve the interests of his client does not make him any less an actor in the state's pervasive adjudicatory construct. State action comes from the attorney's overall partic-

---

[1]. And today in all cases involving the possibility that the accused will lose his liberty. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

ipation in the machinery of the judicial branch of a government of divided powers, not merely from what is known or should be known to some "responsible state official connected with the criminal proceeding who could have remedied the conduct." [2]

### 3. The merits

The factual fulcrum of the panel opinion was the action of Fitzgerald's lawyers, pursuant to an agreement with the prosecutor, of "filling a hole" in the prosecution case by putting Fitzgerald on the stand to acknowledge, for purposes of enhancement, that he was the same person who had been convicted of robbery by assault in another county some seven years earlier.[3] This testimony by the defendant discharged the state's· burden, necessary to enhancement, ⁀f proving beyond reasonable doubt that he was the prior offender. The panel did not, and I do not, consider that defense counsel were ineffective in relying upon Bailey v. State, 139 Tex. Cr.R. 260, 139 S.W.2d 599, (1940), as a defense to the charge of robbing the jailer of two keys.

The matter of Fitzgerald's testimony concerning the prior conviction was not raised in the state habeas proceeding. Fitzgerald only contended that his counsel were ineffective because they failed to advise him of a plea bargain offer and because they promised him the trial judge would direct a verdict of acquittal. Thus, while the state habeas judge conducted an evidentiary hearing and found counsel not ineffective, he did not address himself to the issue now under discussion.

The prosecutor's testimony relating to Fitzgerald's taking the stand to identify himself as the prior offender was in part quoted and in part paraphrased in the panel opinion. I set it out in full:

A [T]he other problem was the matter or [sic] proving and establishing identification; the identity of this man that was on trial here and the man over in McLennan County. I would say as of the date of the trial, I had not found anybody in McLennan County who was willing to come over here and testify that this man was the same and identical man that had been convicted in McLennan County. I did have, I had talked to an assistant district attorney, and I do not recall his name at this time, who was with the district attorney's office in McLennan County, I had talked with him over the telephone and he was willing to come but he would give me no assurance that he could make the necessary identification, because he said he had no independent recollection of the fact of identification at that time. I was

---

2. The concept that the failings of a criminal defendant's retained lawyer do not constitute state action has a long pedigree. One important early and often-cited ancestor is Hudspeth v. McDonald, 120 F.2d 962 (CA10, 1941), whose theory has found favor in some of our opinions: e. g., Howard v. Beto, 375 F.2d 441 (CA5, 1967); Langford v. Alabama, 422 F.2d 760 (CA5, 1969); Johnson v. Smith, 447 F.2d 985 (CA 5, 1971); McGriff v. Wainwright, 431 F.2d 897 (CA5, 1970). In McDonald a federal criminal defendant claimed his lawyer was incompetent. Construing the Sixth Amendment, the Tenth Circuit drew a distinction between lacking assistance and being denied the right to assistance. Only denial—which the court implied would not occur unless the United States involved itself by providing an appointed lawyer—would give a defendant the right to challenge a conviction via habeas corpus. Since the defendant had hired his own lawyer, the court found that the government had not denied him the right to effective assistance of counsel, and thus he could not seek habeas.

The words of the Sixth Amendment, lend little support to McDonald. Unlike the First Amendment which begins "Congress shall make no law . . .," the Sixth Amendment does not forbid the government to deny defendants assistance of counsel. It says only that "the accused shall [by tradition a word signalling mandatoriness] enjoy the right . . . to have the Assistance of Counsel." In this light, the McDonald distinction between lacking assistance and being denied assistance seems artificial.

Such viability, if any, as McDonald enjoyed was laid to rest two decades later with Gideon's trumpet. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

3. The panel characterized the prosecutor's testimony concerning this as his "most crucial testimony."

prepared to bring this witness from Waco but it was going to necessitate the trial going over one more day and I advised the Court and I advised Col. Shown and Judge Martin of that fact and to obviate the necessity of bringing a witness over here, they agreed they would put Mr. Fitzgerald on the witness stand and have him stipulate that he was the same and identical person that was convicted in McLennan County. So, after the case was tried and resulted in the sentence it did, it bothered me some.

\* \* \* \* \* \*

A Well, you put me in a sort of a predicament here, because no lawyer likes to judge his peers but, I would have to say that the trial was conducted in such a way that I received, as the District Attorney, I received several windfalls. As for instance, the matter of the proving of the identity of the fellow; it just seemed to me like they were anxious to try the case and get it over with and get out of town. If I'm not mistaken, they stayed over the night after the trial was concluded and Mr. Fitzgerald was brought in court the next morning and sentenced, so they could leave town.

\* \* \* \* \* \*

Q Now, to be sure I understood what you said a moment ago about this matter, this possible witness from McLennan County, did I understand correctly that you told the the [sic] attorneys, Shown and Martin, that the case would have to go over another day for you to get your witness here from McLennan County and they elected to put Otis Ray Fitzgerald on the stand and testify to those facts, rather than spend another day in Anderson County?

A Yes, sir, they wanted to get the case over with that day.

The matter of Fitzgerald's having been put on the stand to identify himself was raised for the first time before the federal habeas judge.[4] He conduct-

ed no further evidentiary hearing but relied upon the state court hearing and finding. Although the specific claim arising from Fitzgerald's having testified for the prosecution had surfaced for the first time in the federal court, the federal judge found: (a) that Fitzgerald was making the same contentions that he had made before the state habeas court; (b) that the merits of the factual contentions raised in federal court had been resolved in the state court hearing; (c) that all material facts presented by Fitzgerald were adequately developed at the state court hearing; (d) that the record of the state hearing touched upon all issues raised by Fitzgerald in his federal application. The federal judge adopted the state court's findings and added his own conclusory finding from the record that Fitzgerald's attorneys "did not fail to give effective assistance" to him. In view of the erroneous predicate, (a) through (d) just above, this separate but generalized finding that counsel were not ineffective cannot be construed as dispositive of the matter of defendant's taking the stand to testify for the prosecution. Thus the issue which the panel recognized as central to the case has never been addressed by any fact-finding court. The majority dispose of this embarrassing fact by speculating about what a fact-finding court might have found if it had been presented with the issue. The crux of Judge Clark's opinion on the merits is that while the evidence establishes that Prosecutor McDonald told defense counsel he had a witness coming the next day to identify Fitzgerald as the person who had committed the prior offense (and thereby procured the agreement to put Fitzgerald on the stand) there is no evidence that the prosecutor tipped his hand and told defense counsel that the expected witness was shaky and might not be able to make the identification. Recognizing that the record is ambiguous, Judge Clark assigns to it what he describes as "the *most plausible* reading" and con-

4. No claim is made that it was by-passed in the state courts.

cludes that a trier of fact *"could have concluded* from a fair appraisal" that nothing more than the need for delay was communicated to the defense attorneys. No case should turn on such ruminations, by this court sitting en banc and three levels removed from the fact-finding court.

Additionally, it seems to me that the majority's critical premise—that [a fact-finder could conclude that] the defense counsel were never told the identification witness might not appear and would be shaky—should not change the result. Counsel were ineffective if, without determining whether Fitzgerald would be prejudiced, they gave away the protection afforded him by the requirement that he be identified beyond reasonable doubt as the person who committed the earlier offense. There is no evidence that the action of defense counsel benefited Fitzgerald in any way, tactics-wise, money-wise, or otherwise. The only evidence of the reason for counsel's action is the prosecutor's testimony that the defense lawyers were anxious to finish the case and get out of town.

I would uphold the panel opinion.[5] But, if it is not to be upheld, then at the minimum the case should be remanded for further evidentiary hearing—federal or state—on the issue of just what defense counsel knew when they surrendered Fitzgerald's possible defense against enhancement.[6]

Summarizing: (1) I agree that ineffectiveness of retained counsel is an error of constitutional proportions, but I do not agree that that principle is limited to the situation in which a responsi-

ble state official knew or should have known of the deficiency. (2) The predicate for the majority's approach is a theory that in some circumstances the lack of effective counsel can be treated as deprivation of a right not fundamental and essential to a fair trial, a theory the Supreme Court has rejected. Finally, (3) I disagree on the merits.

---

5. Possibly it might be necessary to remand to determine, pursuant to the newly adopted principles relating to ineffective retained counsel, the extent to which appropriate state officials knew or should have known of counsel's ineffectiveness. Additionally, I have not considered whether an appropriate remedy would be resentencing without enhancement rather than retrial.

6. It seems to me appropriate to commend the prosecutor who was willing to come for-

ward with testimony that exposed his own actions to question because he felt that he was a participant in injustice. The prosecutor's position was not buried for 17 years. In 1954, immediately after Fitzgerald's sentence commenced, the prosecutor wrote the Texas Pardon and Parole Board that an injustice had been done. He wrote the Board again as late as 1971.