John Wesley MIMS,
Petitioner,

v.

Louie L. WAINWRIGHT, Secretary, Department of Offender Rehabilitation,
Respondent.

No. 72–858–Civ–J–T.

United States District Court,
M. D. Florida,
Jacksonville Division.

Nov. 17, 1975.

McCarthy Crenshaw, Jr., Jacksonville, Fla., for petitioner.

Donald K. Rudser, Asst. Atty. Gen., Tallahassee, Fla., for respondent.

## ORDER

TJOFLAT, District Judge.

This petition for a writ of habeas corpus was filed November 17, 1972 by an inmate of the Florida State Prison at Starke, Florida.[1]  In his petition, John Wesley Mims offered numerous reasons why his conviction for rape was constitutionally invalid and should be set aside by this Court.  Through its Orders of September 14, 1973 and January 28, 1974 the Court dismissed the bulk of petitioner's claims as being without merit.[2]  Only two questions remained for the Court's determination: (1) Was petitioner denied his constitutional right to the effective assistance of counsel?  (2) Was constitutional error committed when a prosecution witness identified petitioner at trial after viewing him at a pretrial one-man show-up? Evidentiary hearings were held on April 22, 1975 and May 21, 1975 to ascertain the facts relating to these two issues, and both parties have submitted memoranda of law.  Before proceeding to the Court's final disposition of these points, it will be necessary to develop in some detail the factual background against which petitioner's claims must be considered.

### The State Court Trial

Petitioner's trial was held from January 26, 1970 to January 29, 1970 in the Circuit Court of Volusia County, Florida.  The alleged crime was the rape of Mrs. Constance Keller in Daytona Beach, Florida, during the early morning hours of July 7, 1969.  Mrs. Keller and a co-worker, Mrs. Lula

---

1. Petitioner has since been transferred to the Union Correctional Institution, Raiford, Florida.

2. Most of the rejected contentions were casualties of the September 14, 1973 Order, which characterized them as mere state trial matters raising no constitutional issue.  This group included the following claims: that the trial judge erred in not having portions of the testimony read at the jury's request (paragraph 2 of the petition) ; that the trial judge should not have allowed, nor should the prosecutor have solicited, the testimony of a witness who claimed that petitioner had raped her, because a grand jury had found "no true bill" as to this charge (paragraph 3 of the petition) ; that another alleged victim should not have been allowed to testify, since she had not reported the alleged incident, and petitioner had not been charged with any offense relating thereto (paragraph 4 of the petition) ; that a police officer should have answered certain questions posed by defense counsel (paragraph 5 of the petition) ; that the prosecutor had lied to the jury in his closing argument (paragraph 9 of the petition) ; that the prosecutor had knowingly allowed a witness to testify concerning an alleged rape as to which a grand jury had found no true bill (paragraph 10 of the petition) ; that the prosecutor attempted to exclude certain evidence relating to the complaining witness' arrest for possession of narcotics (paragraph 11 of the petition) ; that certain errors were committed at the later trial of petitioner and a fellow inmate for contempt of court (paragraph 12 of the petition) ; and that the trial court's denial of a post-conviction motion by petitioner should not have been summarily affirmed.  After examining the state trial transcript, the Court, on January 28, 1974, rejected the claim that petitioner's counsel did not sufficiently probe for inconsistencies in the testimony of prosecution witnesses. Also, in view of petitioner's admission at trial that the complaining witness was with him on the evening in question, the Court dismissed allegations relating to this witness' in-court identification of petitioner.

Clark, were the chief prosecution witnesses, and their testimony established the following version of the events of July 7. The two women had finished their work at the Desert Inn and were proceeding to Mrs. Clark's home for an informal party to which a number of their fellow workers had also been invited. When their cars were stopped at a traffic light, petitioner approached them, identified himself as a deputy sheriff, and warned Mrs. Keller that her automobile's tail light should be repaired. Petitioner then returned to his car and followed the women to Mrs. Clark's home, where he once again spoke to Mrs. Keller concerning the tail light. When petitioner was asked for identification, he drew a pistol and forced Mrs. Keller to leave with him in his car. After petitioner had left, Mrs. Clark called the police and reported the incident. Petitioner took Mrs. Keller to a secluded spot just outside of the town and raped her. While continuing to threaten the victim with his pistol, petitioner drove back into town, where he was recognized by police officers who had been notified of Mrs. Clark's report. Petitioner was apprehended after a lengthy pursuit. At one point in the chase, Mrs. Keller was able to escape from petitioner's car when the vehicle spun in the road and its speed was greatly reduced. Pertinent aspects of Mrs. Keller's and Mrs. Clark's testimony were corroborated by the two police officers who apprehended petitioner, and by a street sweeper operator who had encountered Mrs. Keller after her escape from petitioner's car.

The state also proffered the testimony of four women who would have described petitioner as having perpetrated or attempted similar offenses in the past.

Two of these witnesses were allowed to testify.[3] The first of these was Mrs. Clara Mack, who described an experience markedly similar to the story which had been related by Mrs. Keller and Mrs. Clark. According to Mrs. Mack, petitioner accosted her while she was walking home at one o'clock on the morning of June 15, 1969. After speaking to her from his car and being rebuffed, petitioner followed her to her home, threatened her with a pistol, forced her to drive with him to a wooded area where he raped her, and then drove her back to the vicinity of her home.[4] The other witness was Mrs. Brenda Sue Farley, who testified that petitioner had attempted to abduct her at gunpoint as she left work on July 7, 1969 about half an hour before the alleged rape of Mrs. Keller.

Petitioner was the only witness in his behalf.. His version of the July 7, 1969 incident was that it was the third in a series of dates with Mrs. Keller which Mrs. Clark had arranged in return for small sums of money.[5] He testified that he had contracted a venereal disease as a result of his sexual encounters with Mrs. Keller. On July 7, 1969 he once again arranged to meet with her. However, because he had had to pay for the treatment of his venereal disease, he refused to pay Mrs. Clark for the third meeting. Apparently, petitioner wished the jury to believe that Mrs. Clark's report to the police was in retaliation for his refusal to pay. At any rate, petitioner clearly testified that Mrs. Keller went with him of her own free will. Petitioner admitted that Mrs. Keller ran from the car while the police were attempting to apprehend him; however, he claimed that she had requested to be let out,

3. The other two witnesses, Betty Bryant and Nancy Cohen, allegedly had viewed petitioner's attempt to abduct Brenda Sue Farley. Although Mrs. Farley was permitted to testify to her own experiences, petitioner's counsel succeeded in having the two bystanders' testimony excluded.

4. Mrs. Mack was not allowed to testify concerning an alleged incident approximately

a week after the first, when petitioner entered her home and assaulted her once again. Evidence of this incident was excluded as being insufficiently similar to the facts developed at petitioner's trial.

5. Allegedly, petitioner had paid ten dollars for his first date with Mrs. Keller, and fifteen dollars for the second.

because she did not wish to be discovered with a black man. Under cross examination, petitioner conceded that he had never told this story to the police, offering as an explanation thereof his belief that he would be convicted anyway.

*Petitioner's Sixth Amendment Claims*

■ Petitioner's contentions are among those most frequently raised by prisoners seeking federal habeas relief, and the legal principles governing this Court's determination are not disputed. Turning first to petitioner's claim that he was denied the effective assistance of counsel, the Court notes that such a contention must not be accepted "unless it very clearly appears well grounded" and that the burden of proof rests with the petitioner. See *Williams v. Beto*, 354 F.2d 698, 704 (5th Cir. 1965). In the Fifth Circuit, the standard for court-appointed counsel is whether a lawyer has rendered "reasonably effective assistance" to his client.[6] See *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir. 1974); *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960).

■ It is frivolous to contend that the courtroom advocacy of petitioner's counsel fell below the applicable constitutional standard. A painstaking examination of the trial record reveals virtually nothing which this Court would criticize even with the advantage of hindsight. Counsel's cross-examination of prosecution witnesses was exemplary in its relentless probing for inconsistencies and other weaknesses. Numerous objections to testimony were made, many of which were sustained by the trial court. Upon the motion of counsel, large blocks of potentially damaging testimony were excluded altogether.[7] To the extent, then, that this petition is based upon alleged deficiencies in counsel's trial conduct, it is patently without merit.

■ Petitioner's chief Sixth Amendment claim cannot be rejected so easily. In essence, petitioner argues that his lawyer's pretrial preparation was so inadequate that, regardless of how this Court should characterize counsel's work at trial, counsel's representation as a whole was ineffective. The only serious allegation related to this claim is that counsel failed to investigate properly either the government's witnesses or those suggested by petitioner. Insofar as the government's witnesses are concerned, this contention is refuted by the trial record and by the only credible testimony which has been taken before this Court. Counsel's examination of prosecution witnesses shows that he was fully prepared to deal with them effectively. The female witnesses' rather dubious moral characters were thoroughly explored in a manner reflecting careful investigation.[8] Counsel's probing of the arresting officers demonstrates that he had familiarized himself with the information necessary to cast such doubt as

---

6. There are differences among the circuits as to the *proper standard for court-appointed counsel*. The Second Circuit Court of Appeals, for example, has long held that relief will be granted only if the representation amounted to a "farce and a mockery of justice." See *United State ex rel. Walker v. Henderson*, 492 F.2d 1311, 1312 (2d Cir. 1974), and cases there cited. This standard, with its higher burden of proof for the petitioner, is quite similar to that which measures the effectiveness of retained counsel in the Fifth Circuit. See *Fitzgerald v. Estelle*, 505 F.2d 1334, 1336–37 (5th Cir. 1974).

7. For example, counsel persuaded the trial judge not to allow the testimony of two witnesses (Betty Bryant and Nancy Cohen) who had allegedly seen petitioner's attempted abduction of a waitress on the morning of July 7, 1969. Counsel also was successful in excluding the proffered testimony of Clara Mack to the effect that petitioner had broken into her home and assaulted her approximately two weeks before the alleged rape of Constance Keller.

8. The examination of Mrs. Keller was especially thorough. See pages 178–270 of the trial transcript. Matters discussed in some detail included the witness' prior use of drugs, her extramarital sex life, her presence at parties with black men, the birth of her first child only one month after her marriage, and a host of similar facts. The record also establishes that an investigator working for the attorney visited the scene of the alleged crime with Mrs. Keller. See page 265 of the trial transcript.

could be cast upon their testimony.[9] The testimony of petitioner's counsel before this Court, which was essentially uncontradicted, further confirms that all state witnesses were investigated and that this investigation was adequate.[10] Moreover, no examples have been suggested to this Court of favorable material which would have been uncovered by additional investigation of these witnesses.

In his original pleadings before this Court, petitioner listed seven persons whom he allegedly suggested to his counsel as potential defense witnesses, none of whom counsel either investigated or called at the trial.[11] Several of these were described as alibi witnesses; two of them (Mr. and Mrs. Turner) were represented as having witnessed the encounter between petitioner and Mrs. Keller outside Mrs. Clark's home. Later, in an affidavit presented to this Court, petitioner added the name of Emmett Laster, although no indication was given of the substance of this witness' testimony. Also, investigation by petitioner's present counsel produced Georgia Mae Smith, a neighbor of Mrs. Clark's, who offered a sworn statement that she had seen petitioner walking with a blond white girl.

Testimony by petitioner and his sister (Mrs. Daisy Broxton) before this Court was to the effect that all of these witnesses' names and their possible testimony had been reported to counsel, but that counsel had refused to investigate because of insufficient time and money.

Of the numerous witnesses mentioned at various places in the Court file, only two testified at the evidentiary hearings held in this cause. Mrs. Georgia Mae Smith's testimony repeated the allegations of the affidavit referred to *supra*. By far the more important witness was Mrs. Barbara J. Turner, who testified that she had seen a white girl willingly leave Mrs. Clark's house with petitioner on the morning of the alleged rape. This white girl, according to Mrs. Turner, had been living with Mrs. Clark and was often in the company of black men. None of the alleged alibi witnesses appeared at the hearing, and, in view of petitioner's admission that he was with Mrs. Keller at the time of the alleged rape, it is difficult to see what sort of "alibi" these witnesses could have established.[12]

On the whole, this Court did not find petitioner, his sister, and Mrs. Turner to be credible witnesses. This determination is based primarily upon observations at the habeas hearings. The Court has also considered the entire contents of the voluminous Court file. Particularly illuminating is the fact that petitioner has already been convicted in state court for making false allegations in an attempt to overturn his rape conviction. An examination of the pertinent state court proceedings also reveals that petitioner has had experience in enlisting the aid of others to help him carry out an unfounded attack upon this conviction.[13]

9. For example, see the discussion of geographical details on pages 310–316 of the trial transcript.

10. See pages 41, 48, and 54 of the transcript of the hearing held before this Court on April 22, 1975.

11. These were Earnest Mingo, the owner of "George's Place" (a bar where petitioner allegedly had met with Mrs. Clark and Mrs. Keller), Arthur Hayes, Mary Jones, Robert Cooper, and Mr. and Mrs. Turner. See paragraph 6 of the petition.

12. Nor was the Court impressed by the scanty evidence which it did receive on this point. Sergeant David Mims, Jr., petitioner's brother, claimed that petitioner had told him that he was with Arthur Hayes and Earnest Mingo at the approximate time of the alleged rape,

and that these two men would testify to that effect. See pages 63–65 of the transcript of the April 22, 1975 hearing. However, Sergeant Mims also admitted that Hayes told him he didn't wish to testify and that Mingo said he didn't remember the morning in question. See *id.* at page 66.

13. The convictions were for contempt of court. Petitioner and a fellow inmate, one Elester Samuel (Salty Sam) Roberts, each received a five-month sentence to be served upon the completion of sentences currently outstanding. The decision of the First District Court of Appeal is reported at 259 So. 2d 736 (Fla.App.1972), in which that court affirmed a special commissioner's findings. Respondent has also furnished the Court with a transcription of the hearing before

The Court rejects these witnesses' testimony and credits the evidence of Joseph A. Scarlett, petitioner's trial counsel, to the following effect. Petitioner suggested no potential defense witnesses to his counsel at the pretrial interviews. Although counsel had been made aware of Mrs. Turner's availability as a potential witness, the testimony which at the time of the trial she said she was willing to give was ambiguous, especially on the only crucial points, viz., whether petitioner had used force against the white girl and whether he had brandished a weapon. Counsel's decision not to call Mrs. Turner was a tactical decision and was in no way due to limited time or financial resources.[14] In view of the uncertain and unpredictable nature of Mrs. Turner's possible testimony at trial, counsel decided that it would be preferable to obtain the tactical advantage of both opening and closing the final arguments to the jury, a privilege which Florida law provides to a criminal accused who is the only witness in his behalf.[15] Counsel was especially worried by the fact that he was trying the case against an aggressive prosecutor who, in counsel's opinion, might attempt to take advantage of the inexperienced trial judge by an improper closing argument; hence, counsel felt that it was better to "sandwich" the prosecutor's closing statements with his own rather than to give the state the last word.

In view of the foregoing, this Court cannot find that petitioner was denied his constitutional right to the "reasonably effective" assistance of counsel. None of counsel's decisions amounts to anything more than a "matter of professional judgment," *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965). Because of the Court's findings, petitioner's Sixth Amendment challenge must hinge solely upon counsel's decision not to call Mrs. Turner as a witness and his failure to canvass the neighborhood for persons who might have seen petitioner and Mrs. Keller together.[16] This Court is of the opinion that the reasons given for not calling Mrs. Turner are entirely credible and sufficient. As for the failure to utilize Mrs. Smith, there is no allegation that the existence of this witness was made known to petitioner's counsel, nor is it at all clear that a thorough investigation of the neighborhood would necessarily have produced this witness. Compare *Howard v. Henderson*, 519 F.2d 1176 (5th Cir. 1975). It is also noteworthy that Mrs. Smith did not know the name of petitioner's alleged companion, nor was any evidence presented to this Court which might establish the possible identity of the girl. No other witnesses of petitioner's alleged walks through the neighborhood with young women have been suggested to this Court, and only Mrs. Smith testified on this point. The Court is persuaded that counsel's failure to find Mrs. Smith or similar witnesses raises no constitutional violation.

In summary, the evidence before this Court, establishes that petitioner received the benefit of exemplary trial advocacy and an adequate pretrial investigation. There was no lack of "reasonably effective" representation, and, insofar as the petition is based upon such an allegation, it must be denied.

the special commissioner (Respondent's Exhibit 2). Petitioner's credibility did not improve when it was pointed out to the Court that, in his original habeas petition, petitioner had brazenly continued to pursue the same false allegations which had led to his state court conviction for contempt. See paragraphs 9 and 10 of the petition. Before the Court's attention was drawn to the prior state court proceedings, these allegations had been dismissed by the Court's Order of September 14, 1973.

14. The Court credits Mr. Scarlett's explanation of his statement to the jury in which he contrasted an indigent petitioner's meager funds with the state's extensive resources. Counsel testified that this was an appeal to jury sympathy and that he commonly used this ploy when representing indigent defendants. See page 56 of the transcript of the April 22, 1975 hearing.

15. See Rule 3.250, Florida Rules of Criminal Procedure.

16. Significantly, these are the only aspects of petitioner's ineffective assistance claim which are developed in petitioner's final brief, submitted to this Court on August 19, 1975.

### Clara Mack's In-Court Identification of Petitioner

■ Petitioner's remaining argument is that his conviction should be set aside because a prosecution witness' in-court identification of him was tainted by an illegal pretrial line-up. This witness was Clara Mack,[17] who testified that she had been raped by petitioner shortly before the incident involving Mrs. Keller. Because of the close similarity of the two alleged rapes, there can be little doubt that this testimony was highly damaging to petitioner, and that any alleged constitutional errors in its admission deserve careful scrutiny.[18]

Once again, the basic constitutional standard is clear. In this case, there was no courtroom testimony concerning the pretrial show-up. Rather, the question is whether an improper show-up tainted the in-court identification. Thus, there are essentially two relevant inquiries. First, in the totality of the circumstances, was the pretrial confrontation impermissibly suggestive? See, e. g., *Foster v. California*, 394 U.S. 440, 442–43, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Second, even if the pretrial confrontation was improper, is there adequate evidence of an independent source for the in-court identification? See e. g., *Coleman v. Alabama*, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). Unfortunately, the efforts of both parties to produce Mrs. Mack as a witness in this Court were to no avail, and the Court has therefore not had the benefit of receiving her testimony. Upon a close examination of Mrs. Mack's testimony elsewhere, however, the Court has concluded that there is sufficient evidence to support an informed decision. Compare *Neil v. Biggers,* 409 U.S. 188, 200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Kelly v. Estelle,* 521 F.2d 238 (5th Cir. 1975); *Powell v. Wainwright,* 460 F.2d 1056, 1057 (5th Cir. 1972).

The Court finds that Mrs. Keller and Mrs. Mack viewed petitioner in separate show-ups through a one-way mirror at the police station in Daytona Beach, Florida. However, the Court finds persuasive the trial testimony of Mrs. Mack regarding her opportunity to view petitioner on the night of the alleged rape. At the trial, Mrs. Mack positively identified petitioner as her assailant. She testified that she saw petitioner clearly by good street lighting when the car approached her and that she had an especially good view when she leaned down to look into petitioner's car in response to his salutations. Immediately thereafter, petitioner accosted her again outside her home, near a large street lamp, and Mrs. Clark immediately recognized him. Petitioner then threatened her with a pistol, drove her to a secluded area, raped her, and then drove her back to a spot near her home. The description which Mrs. Mack gave of petitioner's car at the trial matched the descriptions given by other persons. Vigorous and prolonged cross-examination failed to elicit even the slightest doubt as to any of these details. Furthermore, the undisputed evidence before this Court shows that the general descriptions of the rapist and his car which Mrs. Mack gave to the police *before* the show-up matched those of petitioner and his vehicle.[19] In view of all these factors—

---

17. A similar contention with respect to Constance Keller has been dismissed by the Court. See note 2 *supra.* Petitioner has also attempted to construct a constitutional claim from the fact that counsel was not present at either show-up. Any such contention regarding the show-up in this case, which was an investigatory procedure prior to the institution of a formal prosecution, is without merit. See *Kirby v. Illinois*, 406 U.S. 682, 690, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

18. Apparently, the effect of the pretrial show-up was not discussed at petitioner's trial.

Because of the Court's disposition of this matter, it will be unnecessary to consider the possible implications of this fact.

19. See respondent's exhibit 3, which contains the investigative reports of Detective T. C. Galloway. Clara Mack had described her assailant as being a "very large" black male and his car as being "a black and tan late model car." These general descriptions are consistent with the evidence elsewhere in the record as to petitioner and his vehicle.

the good lighting, the clear views of her assailant by the victim, the long period which she spent in close proximity to the culprit, the accurate courtroom description of his car, the fact that the witness was the victim rather than a mere onlooker, and the general adequacy of the witness' descriptions prior to the show-up—the Court concludes that, even if the pretrial show-up was impermissibly suggestive (an issue as to which this Court expresses no opinion), the evidence establishes an independent basis for Mrs. Mack's in-court identification of petitioner. Compare *Powell v. Wainwright, supra* at 1057. Therefore, petitioner is also not entitled to relief because of the allegedly tainted courtroom identification.

On the basis of the foregoing, it is

Ordered that:

The petition for a writ of habeas corpus is denied, and this case is closed.